UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

REBECCA SMITH,

        Plaintiff,

v.

        Case No. 2:12-cv-11333

        Honorable Patrick J. Duggan

COUNTY OF ISABELLA, CASSANDRA
CAMPBELL, individually and in her official
capacity, NOELLE MORLOCK, individually
and in her official capacity, CHRISTOPHER
CLULEY, individually and in his official
capacity, and DOUG KLAWENDER,
individually and in his official capacity,

        Defendants.

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS AND/OR FOR SUMMARY JUDGMENT

This action, commenced pursuant to 42 U.S.C. § 1983 and Michigan law, arises from events transpiring while Plaintiff Rebecca Smith was detained at the Isabella County Jail following an arrest for disorderly conduct and assault and battery at the Soaring Eagle Casino in Mount Pleasant, Michigan. After being arrested by Chippewa Tribal police, Plaintiff was transferred into the custody of the Isabella County Jail. Sheriff Corrections Deputies deemed Plaintiff a suicide risk, necessitating that Plaintiff remove all of her clothing and don a suicide prevention suit. Two female Deputies – Defendants Cassandra Campbell and

Noelle Morlock – accompanied Plaintiff to a cell to accomplish the requisite wardrobe change but, due to Plaintiff's purported noncompliance, two male Deputies – Defendants Christopher Cluley and Doug Klawender – eventually went to the cell to provide assistance.  The Deputy Defendants used escalating amounts of physical force to secure Plaintiff's compliance, ultimately resorting to the use of a taser.[1]

On March 23, 2012, Plaintiff initiated this action against the Deputy Defendants, as well as Defendant Isabella County, asserting the following causes of action: (1) Count I – excessive force in violation of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983; (2) Count II – violations of the Fourth and Fourteenth Amendments for unlawful search and seizure and excessive force pursuant to 42 U.S.C. § 1983;[2] (3) Count III – violation of the Elliott-Larsen Civil Rights Act ("ELCRA"), Mich. Comp. Laws §37.2101 *et seq*.; (4) Count IV – state law assault and battery; (5) Count V – state law gross negligence; and (6) Count VI

---

[1] The Isabella County Sheriff Department's "Taser Alternative Force Policy" defines "taser" as "[a]n Electro-Muscular Disruption (E.M.D.) device that utilizes an electrical discharge that disrupts the body's ability to communicate messages from the brain to the muscles causing motor skill dysfunction."  (Taser Alternative Force Policy, Defs.' Mot. Ex. 2.)

[2] Plaintiff's "Count II" is a general claim brought pursuant to 42 U.S.C. § 1983 against the individual Defendants for the violation of the Fourth and Fourteenth Amendments.  The Court construes the allegations therein to allege an excessive force claim and a breach of privacy under the Fourth Amendment.

– "Isabella County's Constitutional Violations."[3]  Count VI alleges that a municipal policy, custom, or practice of deliberate indifference and/or a failure to train or supervise caused the constitutional violations Plaintiff suffered.

Presently before the Court is Defendants' motion to dismiss and/or for summary judgment filed on June 14, 2013.  Having determined that oral argument would not significantly aid the decisional process, the Court dispensed with oral argument pursuant to Eastern District of Michigan Local Rule 7.1(f)(2).  For the reasons stated herein, the Court grants Defendants' motion in part and denies Defendants' motion in part.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

On October 4, 2010, Chippewa tribal police at the Soaring Eagle Casino in Mt. Pleasant, Michigan, arrested Plaintiff for simple assault of another casino patron and disorderly conduct.  (Jail Record, Defs.' Mot. Ex. 4.)  Plaintiff, who registered a blood alcohol content ("BAC") of .168, was transferred to the Isabella County Jail at approximately 9:54 PM.  (Jail Record, Defs.' Mot. Ex. 4.)

At 10:01 PM, Defendant Klawender conducted an initial medical screening of Plaintiff.  (*Id.*)  The first portion of the screening, entitled "Visual Opinion," consisted of fourteen questions, only four of which were answered.  (*Id.*)

---

[3] The Court has rearranged the order of Plaintiff's six counts.  Counts I through V are stated against the named defendants in their individual and official capacities.  Count VI is against Isabella County.

Klawender indicated that Plaintiff was conscious and under the influence of alcohol but was not under the influence of barbiturates, heroin, or other narcotics and did not display signs of alcohol or narcotic withdrawal.  (*Id.*)   The second portion of this initial screening involved questioning Plaintiff.  (*Id.*)  As with the "Visual Opinion" portion, some questions have no answer provided.  (*Id.*)  The record indicates that Plaintiff said that she was not considering suicide but that she had suffered from a head injury or fainted in the past, that she may have brain damage, and that she had family problems.  (*Id.*)

According to Defendants, after the initial screening and while non-party Deputy Vozar was taking Plaintiff's fingerprints, Plaintiff stated that she wanted to die.  (Jail Incident Report, Defs.' Mot. Ex. 8.)  Defendant Campbell testified at her deposition that Plaintiff told her that she wanted to kill herself.  (Campbell Dep., Defs.' Mot. Ex. 11 at 4:11-14, 12:19-20.)  Plaintiff admits that she made a comment about how her "life was over" but adamantly denies that she was suicidal.  (Pl.'s Dep., Defs.' Mot. Ex. 10 at 145:8-146:4.)  In any event, believing that Plaintiff's "suicidal" comment coupled with her state of intoxication mandated proceeding with caution, Defendants determined that Plaintiff should change into a suicide prevention suit.  When an inmate is placed in such a suit, the inmate is required to disrobe entirely, undergarments included.

The parties largely dispute the events occurring after the Deputy Defendants made the decision to require Plaintiff to change into a suicide prevention suit. However, the parties have submitted video footage from an Isabella County Jail surveillance camera which captured the incident. This footage shows Defendants Campbell and Morlock (both female) following Plaintiff as she enters a holding cell with large clear windows. Once inside, the three individuals walk towards the rear of the cell. About three minutes into the video, Plaintiff removes her pants and takes a seat on the bench inside the cell. Plaintiff testified at her deposition that she complied with the deputies' instructions and removed her pants, but pleaded with the female deputies to allow her to keep her underwear on. (Pl.'s Dep., Defs.' Mot. Ex. 10 at 134:22-25.) The female deputies, however, testified that Plaintiff was actively resisting their directives and flailing her legs and arms. (Campbell Dep., Defs.' Mot. Ex. 11 at 36:18; Morlock Dep., Defs.' Mot. Ex. 12 at 9:19-22, 11:15-18.) The video does not show Plaintiff flailing her arms or legs and in fact shows Plaintiff sitting with her hands in her lap.

According to Defendants, Morlock called for backup while Plaintiff was seated on the bench believing additional assistance was required to address the "elevating" situation. (Morlock Dep., Defs.' Mot. Ex. 12 at 13:23-14:13.) Plaintiff, however, testified that two male deputies who were "hanging out outside the cell . . . just came in" without being called for backup or assistance. (Pl.'s

5

Dep., Defs.' Mot. Ex. 10 at 136:4-6.)  Just before the four minute mark of the video, Defendant Cluley enters the cell, where he said Plaintiff was kicking and flailing.  (Cluley Dep., Defs.' Mot. Ex. 14 at 18:13-14.)  Again, the video does not show either kicking or flailing.

The video then shows Plaintiff being pulled up from her seated position on the bench and the deputies attempt to undress Plaintiff.  At some point, Plaintiff puts on the suicide prevention suit from the waist down.  Defendant Klawender enters the video about four-and-a-half minutes in and is seen standing outside of the cell.  Inside of the cell, Plaintiff faces the cell wall with her arms elevated above her head and her hands pressed against the wall.  Five minutes into the recording, Plaintiff seems to move a bit but it appears as if one of her hands is still on the wall.  Approximately thirty seconds later, there appears to be a minor scuffle as Defendants attempt to remove Plaintiff's shirt.  At this point, Deputy Klawender enters the cell and the four individual Defendants lower Plaintiff to the floor.

According to Defendants, Plaintiff, now face down on the ground, balled up into a fetal position and placed her arms across and underneath her chest to prevent the removal of her clothing.  (Campbell Dep., Defs.' Mot. Ex. 11 at 41:21-42:6.) While on the ground, Defendants Cluley and Klawender applied a mandibular angle pressure point and wrist lock on Plaintiff, respectively.  (Jail Incident Report,

6

Defs.' Mot. Ex. 8.)  Plaintiff was informed that if she continued to resist, she

would be tased.  (*Id.*)  Plaintiff, who at five feet tall and 113 pounds was pinned

down by four deputies,[4] purportedly refused to cooperate despite the warning at

which point Defendant Klawender was given the "nod" by Defendant Campbell,

his supervisor, to apply a five-second drive-stun[5] to Plaintiff's left shoulder. [6] (Jail

Record, Defs.' Mot. Ex. 4; Klawender Dep., Defs.' Mot. Ex. 13 at 32:16-20.)  The

taser application caused Plaintiff to shake and urinate on the floor of the holding

cell.  (Pl.'s Dep., Defs.' Mot. Ex. 10 at 140:25-141:1.)  Plaintiff did, however,

straighten her arms so that the deputies could remove her clothing.  (Jail Incident

Report, Defs.' Br. Ex. 8.)  Although the video does not clearly reveal when

Plaintiff was tased, the Court notes that Plaintiff was placed onto the floor roughly

five-and-a-half minutes into the video and a female officer is seen leaving the cell

---

[4] Plaintiff testified that the deputies were holding her on the ground by her sides, the back of her neck, and her ankles prior to electing to use the taser.  (Pl.'s Dep., Defs.' Mot. Ex. 10 at 140:23-25.)  The video corroborates this testimony.

[5] The Isabella County Sheriff Department's "Taser Alternative Force Policy" defines "drive stun" as "[t]he process of utilizing the TASER as a pain compliance technique.  This is done by activating the TASER and placing it against an individual's body."  (Taser Alternative Force Policy, Defs.' Mot. Ex. 2.)

[6] Defendant Klawender testified that he could not have pulled Plaintiff's hands out from under her chest without hurting her, and that the drive-stun was the least amount of force necessary to remove her hands from their position. (Klawender Dep., Defs.' Mot. Ex. 13 at 13:1-9.)  Defendant Klawender further opined that the drive-stun, while having the same effect as a taser, hurts more because the former involves direct contact with the skin.  (*Id.*)

seven minutes and twenty seconds into the video to retrieve a non-soiled suicide prevention suit for Plaintiff.

Defendants Campbell and Morlock removed Plaintiff's clothing and placed the suicide prevention suit on Plaintiff.  (Campbell Dep., Defs.' Mot. Ex. 11 at 44:10-12.)  The male deputies were present during the removal of Plaintiff's shirt and bra and whether a male participated in removing these items of clothing is unclear in the video.  Once inside the suit, Plaintiff was transported to an adjacent holding cell, where she was offered but declined the opportunity to shower.  (Jail Incident Report, Defs.' Mot. Ex. 8.)  Throughout the night, Plaintiff removed the suicide prevention suit numerous times thereby exposing her naked body. (Campbell Dep., Defs.' Mot. Ex. 11 at 48:4-18.)  In response, Defendants Campbell and Morlock entered Plaintiff's holding cell to put the suit back on her. (*Id*. at 48:16-18.)

As a result of the above-described events, Plaintiff commenced this action on March 23, 2012.  Following a series of stipulations, Defendants filed an Answer to Plaintiff's Complaint on August 24, 2012.  On April 11, 2013, well into the discovery period, Magistrate Judge Michael J. Hluchaniuk granted Plaintiff's counsel's motion to withdraw as counsel.  Plaintiff was given one month to find substitute counsel, which she has been unable to accomplish.  On June 14, 2013, Defendants filed a motion to dismiss and/or for summary judgment and this motion

is presently before the Court.  Plaintiff, now proceeding *in pro per*, filed a timely

response on July 5, 2013.  Defendants replied on July 19, 2013.

## II.    STANDARD OF REVIEW [7]

Federal Rule of Civil Procedure 56 instructs courts to "grant summary

judgment if the movant shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a) (2012).  A court assessing the appropriateness of summary judgment asks

"whether the evidence presents a sufficient disagreement to require submission to a

jury or whether it is so one-sided that one party must prevail as a matter of law."

*Amway Distributors Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th

Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S.

Ct. 2505, 2512 (1986)).

The initial burden of proving the absence of a genuine dispute rests with the

movant, *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548 (1986), who

---

[7] The Court construes Defendants' Motion, titled "Defendants' Motion to Dismiss and/or for Summary Judgment," as a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56.  Because Defendants filed an Answer, (ECF No. 14), a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) is untimely.  A motion for judgment on the pleadings pursuant to Rule 12(c) would have been the proper motion to file given the procedural posture.  Of greater consequence, because Defendants ask this Court to consider video evidence and depositions, a Rule 12 motion is entirely inappropriate.  Fed. R. Civ. P. 12(b) ("If, on a motion under Rule 12(b)(6) or 12 (c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.")

"must support the assertion by: (A) citing to particular parts of materials in the record…; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact[,]" Fed. R. Civ. P. 56(c)(1)(A)-(B).   While this inquiry requires the Court to construe factual disputes, and the inferences there from, in the light most favorable to the non-moving party, only disputes over facts that might affect the outcome of the suit preclude the entry of summary judgment. *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553; *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.

If the moving party discharges their initial burden using the materials specified in Federal Rule of Civil Procedure 56(c), the burden of defeating summary judgment shifts to the non-movant who must point to specific material facts – beyond the pleadings or mere allegation – which give rise to a genuine issue of law for trial. *Anderson*, 477 U.S. at 256, 106 S. Ct. at 2514.  A mere scintilla of evidence supporting the non-movant's claim will not prevent summary judgment; rather, there must be evidence on which a jury could reasonably find for the non-movant. *Hirsch v. CSX Transp., Inc.*, 656 F.3d 359, 362 (6th Cir. 2011).

Moreover, if, "after adequate time for discovery and upon motion," the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case[] and on which that party will bear the burden of proof

at trial[,]" a court should enter summary judgment in favor of the moving party. *Celotex*, 477 U.S. at 322, 106 S. Ct. at 2552. When this occurs, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* 477 U.S. at 323, 106 S. Ct. at 2552. Thus, if the non-movant does not support the elements of a claim or defense, the moving party is "entitled to judgment as a matter of law."

## III.   ANALYSIS

In light of the various claims asserted in the instant action and the necessity of determining whether a constitutional injury was visited upon Plaintiff before addressing qualified immunity and municipal liability, the Court begins its Opinion and Order by analyzing Plaintiff's 42 U.S.C. § 1983 claims against the Deputy Defendants after which it discusses qualified immunity and municipal liability. The Court addresses Plaintiff's state law claims after the federal claims.

### A.   Section 1983 Claims against Deputy Defendants

In order to prevail on a claim brought pursuant to 42 U.S.C. § 1983, a plaintiff must establish: "'(1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law.'" *Miller v. Sanilac Cnty.*, 606 F.3d 240, 247 (6th Cir. 2010) (quoting *Sigley v.*

11

*City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006)).[8]  There appears to be no dispute in this case with regard to the second requirement.  Thus, the Court focuses its attention on whether Defendants have demonstrated an absence of disputed material facts entitling them to judgment as a matter of law with respect to Plaintiff's claims that she was deprived of her federal rights under the Fourth and Fourteenth Amendments to the United States Constitution.

## 1.   *Excessive Force*

In Count I of her Complaint, Plaintiff contends that the Deputy Defendants violated her Fourteenth Amendment right to be free from excessive force when they utilized the taser to exact compliance with the order that she remove her clothing and put on the suicide prevention suit.  In Count II, Plaintiff appears to allege that her Fourth Amendment right to be free from excessive force was similarly violated by the Deputy Defendants.  Defendants argue that their actions did not amount to excessive force and that they are entitled to qualified immunity.

As a preliminary matter, the Court must determine whether Plaintiff's excessive force claim falls under the Fourth or Fourteenth Amendment.[9]  *See*

---

[8] Section 1983 "creates no substantive rights; it merely provides remedies for deprivations of rights established elsewhere." *Gardenhire v. Schubert,* 205 F.3d 303, 310 (6th Cir. 2000).

[9] Which constitutional amendment applies to a particular excessive force claim "is not a purely academic question as the standards of liability vary significantly according to which amendment applies." *Lanman v. Hinson*, 529

*Graham v. Connor*, 490 U.S. 386, 394, 109 S. Ct. 1865, 1870 (1989) ("In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force."); *see also United States v. Lanier*, 520 U.S. 259, 272 n.7, 117 S. Ct. 1219, 1228 n.7 (1997) ("[I]f a constitutional claim is covered by a specific constitutional provision, . . . the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process."). While excessive force claims are often brought under the Fourth Amendment's protection against unreasonable searches and seizures, when no search or seizure is involved in a given case, the Supreme Court has indicated "that the substantive component of the Fourteenth Amendment's due process clause is the most appropriate lens with which to view an excessive force claim." *Darrah v. City of Oak Park*, 255 F.3d 301, 306 (6th Cir. 2001) (citing *Cnty. of Sacremento v. Lewis*, 523 U.S. 833, 843-44, 118 S. Ct. 1708, 1715 (1998)).

In the Sixth Circuit, the applicable amendment "depends on the status of the plaintiff at the time of the incident, whether free citizen, convicted prisoner, or something in between." *Lanman v. Hinson*, 529 F.3d 673, 680 (6th Cir. 2008) (citing *Phelps v. Coy*, 286 F.3d 295, 299 (6th Cir. 2002)). "Because the Fourth

---

F.3d 673, 679-80 (6th Cir. 2008) (citing *Darrah v. City of Oak Park*, 255 F.3d 301, 306 (6th Cir. 2001) (differentiating the "objective reasonableness" test of the Fourth Amendment from the heightened "shocks the conscience" test of the Fourteenth Amendment)).

13

Amendment's protection against unreasonable seizures seems primarily directed to the *initial* act of restraining an individual's liberty," the Sixth Circuit holds that a pretrial detainee's excessive force claim is governed by the Fourteenth Amendment's due process clause.  *Lanman*, 529 F.3d at 680 (internal quotation marks and citations omitted) (emphasis in original).  In this case then, Plaintiff , who was detained at the Isabella County Jail following her arrest for simple assault and disorderly conduct, was a pretrial detainee and the Fourteenth Amendment, not the Fourth, supplies the appropriate analytical framework for her excessive force claim against the Deputy Defendants.  As such, Plaintiff's Fourth Amendment excessive force claim fails as a matter of law and is accordingly dismissed with prejudice.

The substantive due process rights of the Fourteenth Amendment generally protect citizens from the arbitrary exercise of governmental power.  *Darrah*, 255 F.3d at 306 (citing *Lewis*, 523 U.S. at 845, 118 S. Ct. at 1716).  As pertinent here, the Sixth Circuit holds that the Due Process Clause of the Fourteenth Amendment "protects [] pretrial detainee[s] from the use of excessive force that amounts to punishment."  *Leary v. Livingston Cnty.*, 528 F.3d 438, 443 (6th Cir. 2008) (quoting *Graham*, 490 U.S. at 395 n.10, 109 S. Ct. at 1871 n.10).

"The test applied by the Supreme Court to determine when governmental conduct reaches [the] threshold [of an arbitrary exercise of power] is to ask

14

whether the alleged conduct 'shocks the conscience.'"  *Darrah*, 255 F.3d at 306

(quoting *Lewis*, 523 U.S. at 846, 118 S. Ct. at 1717).  This inquiry is dependent

upon the factual circumstances present in a given case, particularly the events

preceding the incident claimed to amount to excessive force.  *Lewis*, 523 U.S. at

851-53, 118 S. Ct. at 1718-20.   As the Sixth Circuit has explained, where the

implicated government actors

> are afforded a reasonable opportunity to deliberate
> various alternatives prior to electing a course of action . .
> . , their actions will be deemed conscience-shocking if
> they were taken with "deliberate indifference" towards
> the plaintiff's federally protected rights.   In
> contradistinction, in a rapidly evolving, fluid, and
> dangerous predicament which precludes the luxury of
> calm and reflective pre-response deliberation . . . , public
> servants' reflexive actions "shock the conscience" only if
> they involved force employed "maliciously and
> sadistically for the very purpose of causing harm" rather
> than "in a good faith effort to maintain or restore
> discipline."

*Claybrook v. Birchwell*, 199 F.3d 350, 359 (6th Cir. 2000) (quoting *Lewis*, 523

U.S. at 852-53, 118 S. Ct. at 1719-20)).

The question in this case, then, is whether the Deputy Defendants' conduct

in tasing Plaintiff constitutes governmental action that shocks the conscience.

Construing the situation in the instant case as one "arising from a fluid situation

precluding calm and reflective pre-response deliberation[,]" Defendants contend

that summary judgment is proper because Plaintiff cannot point to facts tending to

15

show that the Deputy Defendants employed force "maliciously and sadistically for the very purpose of causing harm[.]" (Defs.' Br. 20 (citation omitted).) The Court disagrees that this is the applicable standard. The situation at the Isabella County Jail does not appear to have involved a "dangerous predicament" which would have "preclude[d] the luxury of calm and reflective pre-response deliberation." *Claybrook*, 199 F.3d at 359. Rather, in the moments leading up to the application of the drive-stun to Plaintiff's left shoulder, the four Deputy Defendants had Plaintiff – who, at the time of the incident, was five feet tall and weighed 113 pounds – subdued on the floor, having implemented several lock techniques to restrict her movement. Thus, Defendants appear to have had "a reasonable opportunity to deliberate various alternatives prior to electing a course of action[.]" *Id.* Accordingly, the individual Defendants will be held liable if their actions "were taken with deliberate indifference towards . . . [Plaintiff's] federally protected rights." *Id.* (internal quotation marks and citation omitted).

Despite Defendants' efforts to paint Plaintiff as physically out of control and actively resisting their orders and efforts to place Plaintiff in a suicide prevention suit, they have failed to discharge their summary judgment burden of demonstrating an absence of disputed material facts. While the depositions of the individual Defendants are consistent in painting this picture, Plaintiff testified during her deposition that she "complied with everything [the deputies] asked me

16

to do."  (Pl.'s Dep., Defs.' Mot. Ex. 10 at 134:18-19.)  She further testified that she

did not push anyone's hands away while attempting to disrobe her and that she

never attempted to hit or kick any of the deputies.  (*Id.* at 151:21-152:25.)  This

conflicting testimony clearly illustrates the existence of disputed material facts.[10]

Moreover, the Court has reviewed the video evidence submitted by the parties,[11]

and finds that while the video evidence here does not blatantly contradict the

Deputy Defendants' version of the facts, it certainly does not corroborate their

version.  *Cf. Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776 (2007)

("When opposing parties tell two different stories, one of which is blatantly

contradicted by the record, so that no reasonable jury could believe it, a court

should not adopt that version of the facts for purposes of ruling on a motion for

summary judgment.").

  In *Scott*, the Supreme Court indicated that when equipped with video

evidence, the Court should "view[ ] the facts in the light depicted by the

---

[10] To the extent that Defendants' discussion of Plaintiff's BAC the night she
was arrested and of her history of alcohol abuse is intended to call Plaintiff's
credibility into question, (Defs.' Br. 1, 9-10), the Court declines the invitation.
Credibility determinations are jury functions, not those of a judge.  *See, e.g.*,
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1986).

[11] It is entirely proper to consider the videotape on summary judgment.  *See,
e.g.*, *Dunn v. Matatall*, 549 F.3d 348, 353 (6th Cir. 2008) (explaining that *Scott v.
Harris*, 550 U.S. 372, 127 S. Ct. 1769 (2007), plainly permits the evaluation of
video evidence and, in fact, "instructs us to determine as a matter of law whether
the evidences depicted on [a] video, taken in the light most favorable to [the
nonmoving party], show that the Officers' conduct was objectively reasonable").

videotape." *Id.* at 381, 127 S. Ct. at 1776; *see also Marvin v. City of Taylor*, 509

F.3d 234, 239 (6th Cir. 2007). Because the video lacks sound, it is impossible to

determine what the parties said during the times they appear to speak. Importantly,

it is not clear from the video that Plaintiff refused to cooperate with Defendants

Campbell and Morlock's directives to remove her clothing, or whether she resisted

the individual Defendants' efforts to disrobe her before or after being lowered to

the floor. Moreover, Plaintiff is largely blocked from view by one of the deputies

while lying on the floor; thus, it is impossible to determine if, at that time, she

actively resisted the deputies' efforts to remove her clothing before Defendant

Klawender applied the drive-stun to her shoulder. Viewing these facts in the light

most favorable to Plaintiff, she was perhaps uncooperative but not dangerous or

threatening, and a question of fact therefore remains as to whether the use of the

taser was excessive.[12]

---

[12] The Court notes that even though the Sheriff cleared the Deputy
Defendants of wrongdoing after an internal investigation of the tasing incident and
in fact indicated that they were in compliance with internal policies, the Court is
not bound by this determination. (Defs.' Br. 4.) Upon examining the Isabella
County Sheriff Department's Taser Alternative Force Policy, which offers a list of
"Deployment Considerations" in connection with the use of a taser or drive stun,
the Court rejects the results of the internal investigation. The "Deployment
Considerations" include: (1) the subject's actions; (2) the number of subjects and
officers present; (3) the skill level of the subject; (3) the ability of the officer to
gain control of the subject; and (4) the age and sex of the subject. (Taser
Alternative Force Policy, Defs.'s Mot. Ex. 2.)

Viewing the evidence in the light most favorable to Plaintiff, the acts depicted before, during, and after the struggle in the holding cell give rise to a genuine dispute of material fact as to whether the individual Defendants applied "excessive force that amounts to punishment," *Graham*, 490 U.S. at 395 n.10, 109 S. Ct. at 1871 n.10, and if their actions therefore "shock the conscience," *Lewis*, 523 U.S. at 847, 118 S. Ct. at 1717.  The Court concludes that a reasonable jury viewing the evidence could find in favor of Plaintiff and that summary judgment is therefore inappropriate on the basis that Defendants did not, as a matter of law, violate Plaintiff's constitutional rights.

## 2.    *Fourth Amendment Claims*

In Count II of her Complaint, Plaintiff alleges that the individual Defendants violated her Fourth Amendment rights in two ways: first, "Defendants did not have search warrants or other lawful authority to strip Plaintiff of her clothing[,]" and second, violated her right to "[f]reedom from deprivation of privacy[.]"  (Compl. ¶¶ 29-30.)

Plaintiff's argument regarding a search warrant fails as a matter of law as it is axiomatic that a search warrant is unnecessary to search an arrestee facing detention at a jail.  *Cf. Florence v. Bd. of Chosen Freeholders*, 132 S. Ct. 1510, 1518 (U.S. 2012) ("Correctional officials have a significant interest in conducting a thorough search as a standard part of the intake process.").  Moreover, as explained

19

more fully below, the Court finds that the removal of Plaintiff's clothing was justified and that the cross-gender exposure of Plaintiff's body does not rise to a constitutional violation.[13]

"The applicability of the Fourth Amendment turns on whether the person invoking its protection can claim a justifiable, reasonable, or legitimate expectation of privacy that has been invaded by government action." *Wilson v. City of Kalamazoo*, 127 F. Supp. 2d 855, 859 (W.D. Mich. 2000) (McKeague, J.) (citing *Hudson v. Palmer*, 468 U.S. 517, 525, 104 S. Ct. 3194, 3199 (1984)).  In *Bell v. Wolfish*, the Supreme Court employed a "reasonableness" standard in evaluating Fourth Amendment rights of a pretrial detainee, considering "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id.*, 441 U.S. 520, 559, 99 S. Ct. 1861, 1884 (1979).  If a regulation or policy impinges on Fourth Amendment rights, it will nonetheless be upheld as valid if it is reasonably related to legitimate penological interests. *Turner v. Safley*, 482 U.S. 78, 89, 107 S. Ct. 2254, 2262 (1987); *Cornwell v. Dahlberg*, 963 F.2d 912, 916 (6th Cir. 1992).  This rational relationship test requires analyzing and balancing several factors, such as:

> (1) whether there is a valid, rational connection between the prison policy and the legitimate governmental interest

---

[13] To the extent Plaintiff complains of the manner in which the individual Defendants removed her clothing, this complaint coalesces with her Fourteenth Amendment due process claim discussed *supra*.

> asserted to justify it; (2) the existence of alternative means for inmates to exercise their constitutional rights; (3) the impact that accommodation of these constitutional rights may have on other guards and inmates, and on the allocation of prison resources; and (4) the absence of ready alternatives as evidence of the reasonableness of the regulation.

*Cornwell*, 963 F.2d at 917.

Although the Fourth Amendment's traditional protections do not apply fully to inmates or pretrial detainees, *Hudson*, 468 U.S. at 527-28, 104 S. Ct. at 3200-01, the Sixth Circuit has "recognized that inmates retain limited rights to bodily privacy under the Fourth Amendment[,]" *Wilson*, 127 F. Supp. 2d at 860 (citing *Cornwell v. Dahlberg*, 963 F.2d 912, 916 (6th Cir. 1992) (additional citations omitted)).  This limited right to shield one's naked body from view by others applies particularly to cross-gender exposure.  For instance, in *Cornwell*, 963 F.2d 912, the court held that a prison inmate had a Fourth Amendment privacy interest that may have been violated when he was strip-searched in view of female prison guards and others after a prison uprising.  In *Kent v. Johnson*, 821 F.2d 1220 (6th Cir. 1987), the court held that an inmate challenging a Michigan prison's regulation stated a Fourth Amendment claim in light of *Turner*'s four factors where he "alleged that the defendants-appellees' policy and practice of according female prison guards full and unrestricted access to all areas of the housing unit at the prison allows the female guards to view him performing necessary bodily

21

functions in his cell and to view his naked body in the shower area." *Id*. at 1222.

The court observed that "[p]erhaps it is merely an abundance of common

experience that leads inexorably to the conclusion that there must be a fundamental

constitutional right to be free from forced exposure of one's person to strangers of

the opposite sex when not reasonably necessary for some legitimate, overriding

reason, for the obverse would be repugnant to notions of human decency and

personal integrity." *Id*.

     The situation in the instant action is distinguishable from the above-cited

cases.  Although the parties dispute whether Plaintiff's comment about her life

being "over" expressed an intent to commit suicide, Plaintiff admits that she made

such a comment.  (Pl.'s Dep., Defs.' Mot. Ex. 10 at 145:8-146:4.)  Out of an

abundance of caution, and perhaps in recognition that the failure to adequately

address Plaintiff's psychological needs could result in a lawsuit based on

"deliberate indifference" to those needs, *see Horn v. Madison Cnty. Fiscal Ct.*, 22

F.3d 653, 660 (6th Cir. 1994), the Deputy Defendants elected to require Plaintiff to

wear a suicide prevention suit.  At first, only the two female deputies were with

Plaintiff when they asked that she change.  Although two men eventually entered

the cell and saw Plaintiff's exposed body, the exposure was brief, lasting no more

22

than ten minutes.[14]  This brief exposure differentiates this case from *Kent*, where the court found a constitutional violation based on routine cross-gender bodily exposure.  821 F.2d at 1222.  By contrast, in *Mills v. City of Barbourville*, the Sixth Circuit held that the accidental viewing of a naked prisoner by guards of the opposite sex is not a constitutional violation.  389 F.3d 568, 578-79 (6th Cir. 2004).  While this case does not involve accidental viewing, neither does Plaintiff allege that such incidents routinely occur.

For the reasons stated above, the Court concludes that summary judgment as to all Defendants is proper with respect to Plaintiff's Fourth Amendment claims.

### 3.  *Qualified Immunity*

The individual Defendants assert that they are entitled to summary judgment with respect to Plaintiff's § 1983 claims under the doctrine of qualified immunity.  "[Q]ualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982)).  A "defendant enjoys

---

[14] Plaintiff claims that the individual Defendants then exposed Plaintiff's naked body to the two named male deputies, a number of other prisoners, trustees, and nurses.  (Pl.'s Dep., Defs.' Mot. Ex. 10 at 127:18-132:23.)  The video evidence, however, clearly shows that only the two male deputies were around during the removal of Plaintiff's clothes.

qualified immunity on summary judgment unless the facts alleged and evidence produced, when viewed in the light most favorable to plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established." *Jefferson v. Lewis*, 594 F.3d 454, 459 (6th Cir. 2010) (citations and internal quotation marks omitted). Having found that Plaintiff's allegations, if true, establish a violation of Plaintiff's Fourteenth Amendment right to be free from excessive force but not of Plaintiff's Fourth Amendment rights, *see supra*, the Court focuses on the second prong.

The Court must determine whether the right to be free from excessive force was clearly established on October 4, 2010, the date on which the encounter at Isabella County Jail transpired. In order to assert a violation of a "clearly established" right and defeat a qualified immunity defense, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039 (1987). In other words, "in light of the pre-existing law the unlawfulness must be apparent." *Id.*

The Court concludes that given the abundance of Sixth Circuit case law, a pretrial detainee's right to be free from the use of excessive force amounting to punishment was "clearly established" law at the time of the underlying conduct. *See, e.g.*, *Leary*, 528 F.3d at 443 (quoting *Graham*, 490 U.S. at 395 n.10, 109 S. Ct.

24

at 1871 n.10); *United States v. Budd*, 496 F.3d 517 (6th Cir. 2007).  The Court

believes that Plaintiff has supported her excessive force allegations with sufficient

evidence to indicate that the use of the taser was objectively unreasonable in light

of this clearly established law.  *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir.

1999) (en banc).  Moreover, disputed issues of material fact remain as to whether

Defendants acted with the requisite legal justification.  Although the Deputy

Defendants propose as fact that Plaintiff was not only resistant but combative

during their attempts to place her in the suicide prevention suit, they fail to explain

how a small and fully restrained woman posed an immediate danger to herself or

others such that the use of a powerful electric shock was necessary.  Although

Defendant Klawender testified that he considered the taser the least risky avenue of

securing Plaintiff's compliance, a question remains as to whether force of any kind

was necessary less than two minutes into Plaintiff being fully restrained by four

deputies.   Lastly, having found that the facts, if true, establish a Fourteenth

Amendment violation, which in turns requires a demonstration of deliberate

indifference, the Court finds that summary judgment is improper at this stage

because a defendant displaying deliberate indifference cannot simultaneously

believe that his or her actions were lawful.

This, however, does not end the Court's inquiry as the Sixth Circuit "has

consistently held that damage claims against government officials arising from

25

alleged violations of constitutional rights must allege, with particularity, facts that demonstrate what *each* defendant did to violate the asserted constitutional right." *Lanman*, 529 F.3d at 684 (citation omitted).   While the Court finds that there are questions of fact as to whether some Defendants approved of or utilized excessive force, Plaintiff has failed to allege sufficient facts demonstrating that all four Deputy Defendants employed excessive force. Specifically, Defendant Klawender actually used the taser on Plaintiff after receiving "authorization" from Defendant Campbell.  (Defs.' Br. 3.)  Thus, questions of fact remain with respect to these Defendants and whether they are entitled to qualified immunity.  On the other hand, Defendants Morlock and Cluley, both of whom were involved in lowering Plaintiff to the floor and the latter of whom applied various hold techniques to exact Plaintiff's compliance, neither authorized nor utilized the taser use.  (*Id.*)  As such, Plaintiff has failed to allege specific facts as to Morlock and Cluley and the Court finds that granting summary judgment in their favor is appropriate.

Accordingly, the Court denies Defendants' qualified immunity defense as to Defendants Campbell and Klawender but grants summary judgment in favor of Morlock and Cluley, who are both dismissed from this action.

## 4.    *Municipal Liability*

Plaintiff also brings a claim under § 1983 against Isabella County, alleging that "Defendant Isabella County acted recklessly and/or with deliberate

26

indifference when it practiced and/or permitted customs and/or policies and/or practices that resulted in constitutional violations to Plaintiff."  (Compl. ¶ 44.) Plaintiff further alleges that the County should be liable based on a failure to train or supervise theory.  (*Id.* at ¶ 45.)

"A plaintiff who sues a municipality for a constitutional violation under § 1983 must prove that the municipality's policy or custom caused the alleged injury."  *Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006) (citing *Monell v. New York City Dep't Soc. Servs.*, 436 U.S. 658, 690-91, 98 S. Ct. 2108, 2036 (1978); *see also Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403, 117 S. Ct. 1382, 1388 (1997) (citations omitted).  "[T]o prove the existence of a municipality's policy or custom, plaintiffs 'can look to (1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final [policy]-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations.'"  *Mann v. Helmig*, 289 F. App'x 845, 848-49 (6th Cir. 2008) (quoting *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005)).   In this case, Plaintiff pursues the third avenue.

A municipality's failure to train or failure to provide adequate training is a method of demonstrating the existence of an unlawful policy or custom supporting municipal liability under § 1983.  *See, e.g., City of Canton v. Harris*, 489 U.S. 378,

109 S. Ct. 1197 (1989); *Ellis*, 455 F.3d at 700.  "A municipality may be liable under § 1983 for a failure to train its employees or to institute a policy to avoid the alleged harm where the need to act 'is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need.'"  *Heyerman v. Cnty. of Calhoun*, 680 F.3d 642, 648 (6th Cir. 2012) (quoting *Harris*, 489 U.S. at 390, 109 S. Ct. at 1205).

To prevail on a failure to train claim, a plaintiff must establish three elements: "(1) the training [] was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury."  *Ellis*, 455 F.3d at 700 (citation omitted).

Here, Plaintiff fails to identify any evidence to support her claim that the policies, practices, or customs of Isabella County caused, or contributed to, the alleged constitutional violations by the individual Defendants.  Further, Plaintiff fails to even indicate which Isabella County policy(s), practices or customs, if any, are at issue in this matter.  Plaintiff's § 1983 claim against Isabella County fails as a matter of law and is accordingly dismissed.

Relatedly, the Court dismisses the official capacity actions against the four deputies as an official capacity action is nothing more than a suit against Isabella

County.  *See, e.g.*, *Leach v. Shelby Cnty.*, 891 F.2d 1241, 1245-46 (6th Cir. 1989) ("[The plaintiff's] suit against the Mayor and the Sheriff of Shelby County in their official capacities is, therefore, essentially and for all purposes, a suit against the County itself."); *Kentucky v. Graham*, 473 U.S. 159, 166, 105 S. Ct. 3099, 3105 (1985) ("[A]n official capacity suit is, in all respects other than name, to be treated as a suit against the entity.").  Having found that Plaintiff's municipal liability claim fails as a matter of law, dismissal of the individual defendants in their official capacities is proper.

**B.      State Law Claims Against Individual Defendants**

*1.      Plaintiff's ELCRA Claim*

Plaintiff brings a claim against the individual Defendants alleging discrimination on the basis of sex in a place of public accommodation or public service, in violation of the Elliot-Larsen Civil Rights Act ("ELCRA"), Mich. Comp. Laws § 37.2101 *et seq*.  Plaintiff contends that she is a member of a protected class under the statute, that the individual "Defendants were predisposed to discriminate against persons in this class, and Defendants acted upon that predisposition when the discriminatory acts occurred."  (Compl. ¶¶ 36, 39.)

The statute provides, in pertinent part:

> (1) The opportunity to obtain employment, housing and other real estate, and the full and equal utilization of public accommodations, public service, and educational facilities without discrimination because of religion, race,

29

> color, national origin, age, sex, height, weight, familial
> status, or marital status as prohibited by this act, is
> recognized and declared to be a civil right.

Mich. Comp. Laws § 37.2102(1).  The Michigan courts have held that this

legislation applies to inmates in state correctional facilities.  *See Neal v. Dept. of*

*Corr.*, 232 Mich. App. 730, 741, 592 N.W.2d 370, 376 (1998).

To prevail on her ELCRA claim, Plaintiff must establish the following: "(1)

discrimination based on a protected characteristic (2) by a person (3) resulting in

the denial of the full and equal enjoyment of the goods, services, facilities,

privileges, advantages, or accommodations (4) of a place of public

accommodation."  *Hayes v. Neshewat*, 477 Mich. 29, 35, 729 N.W.2d 488, 492

(2007).  To establish the first element, Plaintiff may prove either disparate

treatment or disparate impact by Defendants.  *See Duranceau v. Alpena Power*

*Co.*, 250 Mich. App. 179, 181-82, 646 N.W.2d 872, 874 (2002) (citation omitted).

"Disparate treatment may be proved by showing that the plaintiff is a member of a

protected class and was treated differently than persons of a different class for the

same or similar conduct."  *Sanders v. Sw. Airlines Co.*, 86 F. Supp. 2d 739, 744

(E.D. Mich. 2000) (citing *Reisman v. Regents of Wayne State Univ.*, 188 Mich.

App. 526, 538, 470 N.W.2d 678, 685 (1991)).  "Under either theory, a plaintiff

claiming that an action is motivated by discrimination must produce some facts

from which a factfinder could reasonably infer unlawful motivation." *Id*. (citation omitted).

Here, Plaintiff is a member of a protected class. Plaintiff, however, has failed to produce any evidence demonstrating that Defendants had a pre-disposition to discriminate against members of that protected class. In fact, Plaintiff testified that "[she] do[es] not understand . . . why they did what they did." (Pl.'s Dep., Defs.' Mot. Ex. 10 at 143:23-25.) Plaintiff has also failed to show that she was treated differently than persons of a different class for the same or similar conduct. Absent such evidence, Plaintiff cannot make out a claim under the ELCRA. Therefore, this Court grants Defendants' motion with respect to Plaintiff's ELCRA claim.

**2.**   ***Assault and Battery and Gross Negligence Claims***

Defendants argue that the individual Defendants are immune from Plaintiff's assault and battery claim pursuant to Michigan's Governmental Tort Liability Act ("GTLA" or the "Act"). Mich. Comp. Laws § 691.1407. Defendants further contend that the Deputy Defendants' conduct did not amount to gross negligence.

Pursuant to the GTLA, an individual officer or agent of a governmental agency is immune from tort liability for injuries to persons if all of the following conditions are met:

(a) The officer, employee, member, or volunteer is acting or reasonably believes he or she is acting within the scope of his or her authority.

(b) The governmental agency is engaged in the exercise or discharge of a governmental function.

(c) The officer's, employee's, member's, or volunteer's conduct does not amount to gross negligence that is the proximate cause of the injury or damage.

Mich. Comp. Laws § 691.1407(2). The Act defines "gross negligence" as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." *Id.* § 691.1407(2)(c). The Act further provides that "[s]ubsection (2) shall not be construed as altering the law of intentional torts as it existed prior to the effective date of subsection (2)." *Id.* § 691.1407(3).

Prior to the effective date of subsection (2), governmental immunity generally was not available as a defense to an intentional tort claim. *Sudul v. Hamtramck*, 221 Mich. App. 455, 458, 562 N.W.2d 478 (1997). However, "[g]overnmental actions which would normally constitute intentional torts [were] protected by governmental immunity if those actions [were] justified." *Brewer v. Perrin*, 132 Mich. App. 520, 528, 349 N.W.2d 198, 202 (Mich. Ct. App. 1984*); Burns v. Malak*, 897 F. Supp. 985 (E.D. Mich. 1995). As the Michigan Court of Appeals explained in *Brewer*, justifiable actions are those "which an ordinarily prudent and intelligent person with the knowledge and in the situation of the [] officer, would have deemed necessary." 132 Mich. App. 528, 349 N.W.2d at 202

32

(internal citations and quotation marks omitted); *see also Vanvorous v. Burmeister*, 262 Mich. App. 467, 483, 687 N.W.2d. 132, 142 (2004).  Thus, for example, under Michigan law a police officer is immune from tort liability for injuries caused during an arrest if the officer used reasonable force when making the arrest.  *Id.*

As with the qualified immunity defense, *see supra*, the Court finds that Plaintiff has failed to demonstrate that the GTLA should not apply to Defendants Cluley and Morlock.  However, the Court believes that the individual Defendants involved in the deployment of the taser – namely Defendants Campbell and Klawender – have not established their entitlement to governmental immunity. Construing all inferences in the light most favorable to Plaintiff, the Court finds that malice could reasonably be inferred from the alleged misconduct.  According to Plaintiff, despite at all times complying with the individual Defendants' directives, the deputies threw her onto the floor, held her down, and tased her. (Pl.'s Dep., Defs.' Mot. Ex. 10 at 140:23-25.)  These facts, if true, could give rise to the inference that the individual Defendants acted with malice or acted without concern for whether Plaintiff was injured.  At this stage of the proceedings, Plaintiff is entitled to this inference.  Accordingly, Defendants' motion is denied with respect to Defendants Campbell and Klawender but granted with respect to Cluley and Morlock.

## IV.   CONCLUSION AND ORDER

33

For the reasons above, the Court finds that disputed issues of material fact preclude the granting of Defendants' motion with respect to Plaintiff's Fourteenth Amendment excessive force claim (Count I) against Defendants Campbell and Klawender.  However, the Court grants summary judgment in favor of Defendants Cluley and Morlcok on Count I, finding that they are entitled to qualified immunity.   The Court disposes of Plaintiff's state law assault and battery and gross negligence claims in the same manner.  Plaintiff's Fourth Amendment claims are dismissed against all Defendants.  Lastly, having failed to point to any evidence supporting municipal liability, the Court concludes that Plaintiff's claims against Isabella County fail as a matter of law and therefore dismisses the County from this action.

Accordingly,

**IT IS ORDERED** that Defendants' motion for summary judgment is **GRANTED IN PART** and Plaintiff's claims arising under the Fourth Amendment and claims regarding municipal liability are **DISMISSED WITH PREJUDICE**;

**IT IS FURTHER ORDERED** that all claims against Defendants Cluley and Morlock are **DISMISSED WITH PREJUDICE** and that Defendants Campbell and Klawender are **DISMISSED IN THEIR OFFICIAL CAPACITIES**;

34

**IT IS FURTHER ORDERED** that Defendants' motion for summary judgment is **DENIED IN PART** as to Plaintiff's Fourteenth Amendment claims against Defendants Campbell and Klawender in their individual capacities as well as Plaintiff's state law tort claims against Defendants Campbell and Klawender.

Date:  August 28, 2013

s/PATRICK J. DUGGAN
UNITED STATES DISTRICT JUDGE

Copies to:

**Rebecca Smith,** *pro per*
**Bonnie G. Toskey, Esq.**